**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　Plaintiff,<br><br>v.<br><br>KYLE M. BOND,<br>　　　Defendant. | Case No. 4:23-cr-40031-JPG |

**DEFENDANT'S SENTENCING MEMORANDUM**

**INTRODUCTION**

Defendant Kyle Bond has proven himself to be a good employee, a provider for his family, and an inspiring father.  He has struggled with substance abuse since he was a teenager, when his mother introduced him to methamphetamine, and his problems with substance abuse contributed to his offense conduct.  He explained that he began carrying a firearm for personal protection after he was physically assaulted at a drug house.  Mr. Bond pleaded guilty, accepts responsibility, and has demonstrated remorse to his wife and daughter, as shown in their sentencing letters.

Mr. Bond respectfully asks for a sentence of 120 months.  A sentence of 10 years is sufficient to comply with the purposes in 18 U.S.C. § 3553(a)(2), including punishment, deterrence, and protection of the public.  A sentence of 120 months would be more than three times longer than Mr. Bond has ever served in actual custody before (he served 32 months ending in November 2011), reflecting an incremental increase over prior sentences.  This recommended sentence is sufficient, but not greater than necessary, and conforms with the parsimony principle in 18 U.S.C. § 3553(a).

**LEGAL STANDARDS**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the

1

punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011). "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Id.* The Court has broad discretion to sentence outside the advisory Guidelines, as the Court is empowered and required to "make an individualized assessment" of a just sentence under the factors presented in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 50 (2007).

## THE GUIDELINES RANGE AND RECOMMENDATION

Mr. Bond accepts the Guideline range calculated by Probation, which also matches the parties' expected range as calculated in the plea agreement: a total offense level of 29, a Criminal History Category of V, and a resulting range of 140-175 months. But as argued below, the Guideline recommended sentence in this case is longer than necessary to comply with the purposes in 18 U.S.C. § 3553(a)(2).

## THE FACTORS UNDER SECTION 3553(a)

**I.    Section 3553(a)(1): the history and characteristics of Kyle Bond and the nature and circumstances of the offense.**

**A.    Mr. Bond's history and characteristics.**

Mr. Bond has overcome many challenging circumstances during his life starting in childhood. His parents split up shortly after Mr. Bond was born. Mr. Bond originally lived with his father, but when he turned five years old a judge gave custody to Mr. Bond's mother. Mr. Bond would have a "horrible" relationship with his mother, PSR ¶ 76, and his mother lived with a man, a "monster," who physically and sexually abused Mr. Bond. PSR ¶ 78. Although Mr. Bond sometimes spent weekends with his father, when the abuse left Mr. Bond with visible bruises, he was not allowed to go visit his father and would have to stay home from school. PSR ¶ 78. Mr. Bond's mother and her paramour also used drugs in the house and in Mr. Bond's presence, including marijuana, cocaine, and methamphetamine. It was not until Mr. Bond turned 10 or 11 years old that he reported the abuse to anyone, and his father

2

was the first person he told.  His father petitioned for and received custody of Mr. Bond when Mr. Bond was 12 years old.  PSR ¶ 78.

Living with his father improved Mr. Bond's life and his father is a "great man."  His father offered emotional support and did his best to provide for Mr. Bond, although they "sometimes went without food."  PSR ¶ 78.  Mr. Bond's father worked a lot, so Mr. Bond was also raised by his grandmother, Judy Heckes.  *Id.*

Mr. Bond was exposed to drug behavior early, as he grew up in neighborhoods where people manufactured methamphetamine, and his mother used drugs in Mr. Bond's presence. He was also prescribed Adderall at an early age, which eventually contributed to Mr. Bond's own use of amphetamines.  PSR ¶ 87.  He started drinking alcohol as a young teenager and started smoking marijuana a couple years later.  PSR ¶ 89.  Unfortunately, when Mr. Bond's mother learned that Mr. Bond was using drugs, she viewed their shared affinity for drug use as a means to connect with her son.  She introduced Mr. Bond to using methamphetamine when he was 16 years old and they used together while Mr. Bond was a teenager and a young adult.  His mother first taught him how to use methamphetamine intravenously.  PSR ¶ 91. Mr. Bond's early introduction to methamphetamine contributed to his use as an adult, all the way through his arrest in this case, save for a period of sobriety while he was on parole.  Mr. Bond's substance use also contributed to his offense conduct.  He told law enforcement that he possessed firearms for personal protection after he was physically assaulted at a drug house.  PSR ¶ 15.  He carried a firearm for personal protection when buying drugs.  PSR ¶ 15.

Mr. Bond has suffered some severe injuries and has a lengthy medical history.  When he was 15 or 16 years old, he got badly burned and injured while fishing with dynamite, resulting in the loss of part of his small intestine.  PSR ¶ 85.  When Mr. Bond was about 21 years old in 2015 he was in a car accident where he was ejected through the windshield and had the car roll over his feet, crushing them.  He still has pins in his feet from that accident. Two years later in 2017, he suffered two strokes and was hospitalized.  PSR ¶ 85.  Heart problems required him to wear a heart monitor for three years until 2022.  *Id.*

As an adult, Mr. Bond became a dedicated and inspiring father.  Mr. Bond has an 18-year-old daughter, Morgan, from his first marriage.  Morgan wrote a support letter for this sentencing proceeding and writes, "My father has always been an inspiration to me, as well as admirable."  Morgan saw her father study hard to become an electrician and work hard to provide for his family.  She writes about how Mr. Bond "always persevered through" his obstacles and has taught Morgan the importance of family, such as when Mr. Bond would wake in the early morning and drive an hour away to help his father despite not being asked for help.  During Mr. Bond's current incarceration, Morgan graduated from high school and got accepted to college where she is pursuing a medical degree; she plans to become a surgeon.  Morgan explains that Mr. Bond "instilled so many character traits that have helped [her] get this far."

Similarly, Mr. Bond's wife, Sarah, wrote a letter speaking to Mr. Bond's character and work ethic.  "He is always ready to show up and work hard for his friends and family whenever they are in need."  Sarah explains that Mr. Bond is a dependable, hard worker who shows up for people who need him.

Mr. Bond also helped care for his grandmother, Judith Heckes, who writes that Mr. Bond helped with upkeep at her home, including installing a new floor.  *See* Heckes Sentencing Letter.  Mr. Bond also ensured that Ms. Heckes had food and got to her doctor's appointments, and he was helping her with these kinds of tasks until his current incarceration. *Id.*

Mr. Bond's work ethic and drive to provide for his family has led to a successful employment history.  He did not finish high school but earned a GED and then earned licenses/certificates.  PSR ¶ 96.  He has worked off and on for a trucking company since he was 16 years old as a mechanic, truck driver, and carpenter, and the company would consider rehiring him.  PSR ¶ 97.  He worked for Arnold Ready Mix until 2021, which would consider rehiring him and where human resources described Mr. Bond as a reliable, "overall good employee."  PSR ¶ 98.

4

In sum, Mr. Bond suffered abuse during his childhood, has struggled with drug use since being introduced to methamphetamine by his mother, and turned himself into a good employee and a dedicated father and provider for his family.

**B.    The nature and circumstances of the offense.**

On January 5, 2023, law enforcement executed a search warrant at Mr. Bond's residence and discovered nine firearms, some of which lacked a serial number and one of which was a short-barrel rifle.  About two months later, on March 21, 2023, law enforcement interviewed Mr. Bond.  *See* PSR ¶ 15.[1]  Mr. Bond admitted his conduct and accepted responsibility.  He explained that he once got physically assaulted at a drug house, and afterward began carrying a firearm for his own protection when he purchased drugs.  PSR ¶ 15.

**II.    Section 3553(a)(2): a sentence sufficient but not greater than necessary to meet the goals of sentencing.**

The parsimony principle in 18 U.S.C. § 3553(a) requires courts to impose a sentence sufficient, but not greater than necessary, to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation."  *Dean v. United States*, 581 U.S. 62, 67 (2017); § 3553(a)(2).  For Mr. Bond, a sentence of 120 months, a full decade, is sufficient to comply with those four purposes.

Ten years in prison is a significant punishment.  It is an especially lengthy punishment for a non-violent possession offense that is not a crime against a person.  A sentence of 120 months is also a much more significant punishment and term of incarceration that Mr. Bond ever served before, so this would be a large incremental increase in punishment.  A review of the PSR's criminal history section shows that Mr. Bond previously served sentences of 4 months, 32 months, and 9 months actual time in custody (November 2007 to March 2008,

---

[1] This interview occurred while Mr. Bond was in custody and facing charges for these firearms in Illinois state court, case 23CF04.  See PSR ¶ 58.  The Illinois Judici website shows that Mr. Bond's attorney in the Illinois case was granted leave to withdraw on March 20, 2023, and law enforcement conducted the in-custody interview of Mr. Bond the next day.

then March 2009 to November 2011, and then August 2016 to June 2017). PSR ¶¶ 42, 43, 46. A sentence of 120 months in this case would be by far his longest sentence. Even with good time credits, 85% of 120 months is 102 months, which is more than three times as long as Mr. Bond has served on any prior sentence. The recommended sentence of 120 months is sufficient to impose just punishment, reflect the seriousness of the offense, and promote respect for the law. 18 U.S.C. § 3553(a)(2)(A).

A 120-month sentence is also sufficient to serve the goal of specific and general deterrence. For Mr. Bond specifically, it matters that a 120-month sentence would be much longer than any previous punishment that he has served. The dramatic increase will have a deterrent effect. Mr. Bond will also be nearly 50 years old after completing this recommended sentence and would have a strong incentive not to return to prison as he ages. He would also have a strong incentive to stay out of custody to continue caring for his family. A 120-month sentence will also serve the goal of general deterrence and send the message that possession of a firearm will incur harsh punishment even when no one is injured and when the firearm is not used in a violent crime.

This recommended sentence is sufficient to protect the public by keeping Mr. Bond incarcerated for 120 months and until he approaches 50 years old. 18 U.S.C. § 3553(a)(2)(C).

Last, a term of 120 months is sufficient to serve the goals of rehabilitation and provide Mr. Bond with needed correctional treatment, medical care, and educational or vocational training. 18 U.S.C. § 3553(a)(2)(D). Mr. Bond desires to engage in treatment for substance abuse while incarcerated. PSR ¶ 93.

In sum, the parsimony principle in § 3553(a) supports the recommended sentence of 120 months, which is sufficient to serve the goals of sentencing.

### III.   The recommended sentence of 120 months will avoid unwarranted sentence disparities.

According to data from the U.S. Sentencing Commission, a sentence of 120 months will also "avoid unwarranted sentence disparities[.]" 18 U.S.C. § 3553(a)(6). For defendants

with § 2K2.1 as the primary Guideline, a Final Offense Level of 29, and a Criminal History Category of V, and excluding any defendants who received a § 5K1.1 departure, the Judiciary Sentencing INformation (JSIN) website shows 63 defendants who received a sentence of imprisonment; the average sentence for those defendants is 109 months and the median is 120 months.  Thus, Mr. Bond's recommended sentence of 120 months is longer than average and exactly at the median.

**IV.    The Guidelines recommend a sentence that is longer than necessary under § 3553(a), and the Court should consider a departure under USSG § 4A1.3.**

"The parsimony principle in § 3553(a) is an important and binding instruction from Congress."  *United States v. King*, 861 F.3d 692, 696 (7th Cir. 2017).  And "a defendant is always free to argue that the Guidelines, taken as a whole or when particular provisions are examined, recommend an unduly harsh sentence in his case."  *Id.*

Mr. Bond has 10 criminal history points, but the last point, the one that increased him from category IV to category V, came from Mr. Bond's guilty plea and probationary sentence in Kentucky state court on August 10, 2023.  PSR ¶ 49.  That Kentucky offense occurred on December 14, 2022, and led to the discovery of the firearms in this case.  On the same day as the current federal offenses, January 5, 2023, a sheriff's deputy in Kentucky contacted the Sheriff's Office for Union County, Illinois, regarding Mr. Bond's suspected theft by check of a gooseneck trailer in Kentucky.  PSR ¶ 36.  Authorities in Union County used that report from Kentucky to obtain a search warrant, executed the warrant later that day, and found the firearms currently charged against Mr. Bond.  Seven months later, on August 10, 2023, Mr. Bond pleaded guilty in Kentucky state court and received a suspended sentence and probation.  PSR ¶ 49.  Just five days later, the government filed the indictment in this case on August 15, 2023.  ECF No. 1.  The Kentucky sentence counts as a one-point "prior sentence" under the Guidelines because it was imposed after the commission of but before sentencing for the instant offense, and is for conduct that is not relevant conduct to the instant offense. *See* Application Note 1, § 4A1.2.  The single point for the Kentucky sentence moved Mr.

Bond from having 9 points to 10, moved him from category IV to category V, and increased the Guideline range by 19-24 months.

The increase of up to two years for the Kentucky sentence contributes to "an unduly harsh [Guideline] sentence in his case." *King*, 861 F.3d at 696. Consider the deterrent value of a prior sentence. Criminal sentencing deters defendants from committing crimes by imposing punishment and then giving the defendant an opportunity to change his behavior and decision making; if the defendant declines that opportunity and continues committing crime, then there is value in increasing punishment for those continued crimes. For Mr. Bond and his Kentucky case, however, the sentence in Kentucky came too late for it to affect his behavior for the instant federal offenses. He had already committed and been arrested for the instant offenses before being sentenced to probation in Kentucky. Of course, the Guidelines treat this Kentucky sentence as a "prior sentence," but the resulting 19-24 month increase in the Guideline range is unduly harsh. Many one-point increases do not affect the Guideline range at all because it merely increases the score within the same category.

Timing is also an issue with the Kentucky sentence. Mr. Bond was arrested on these federal charges on January 5, 2023, and has been incarcerated ever since. He spent seven months in custody before resolving his Kentucky case and being sentenced in Kentucky on August 10, 2023. Just five days later, on August 15, the government filed the instant indictment. Had the indictment been filed before Mr. Bond resolved the Kentucky case, Mr. Bond almost certainly would have resolved the federal case before the Kentucky case, would not receive any point for the Kentucky case, and would fall in CHC IV. If Mr. Bond had not pleaded guilty in Kentucky, he would fall in CHC IV and his Guideline range would be up to 24 months shorter. But by pleading guilty and accepting responsibility, the result is a 19-24 month increase to his range here that is unduly harsh and greater than necessary to serve the goals of sentencing.

Considering the effect this one point had on Mr. Bond's criminal history category, the Court should consider a departure under USSG § 4A1.3(b). This Guideline policy statement

8

allows a "downward departure" when the defendant's criminal history category overrepresents the seriousness of the defendant's criminal history or the likelihood of committing future crimes.  A downward departure means treating the defendant as though he fell in a lower category.  *See* § 4A1.3 Application Note 1, incorporating definition from § 1B1.1.

The 12 levels of specific offense characteristics for Mr. Bond also contribute to a Guidelines range that is greater than necessary to serve the goals of sentencing in § 3553(a)(2).  There are 4 levels added under § 2K2.1(b)(1)(B) because the offense involved between 8 and 24 firearms (there were nine involved).  PSR ¶ 25; ECF No. 47 ¶ 3.  Two of the firearms, however, were registered to and belonged to Mr. Bond's family members.  PSR ¶ 15.  For several "long" firearms at issue, Mr. Bond "fished" them out of a creek, PSR ¶ 15, and told law enforcement that they "weren't really good for nothing but they were cool wall hangers."  Although inoperable firearms count under the Guidelines, *see United States v. Brown*, 117 F.3d 353, 355 (7th Cir. 1997), they are less dangerous than operational firearms, and the distinction between operable and inoperable firearms matters when considering "the seriousness of the offense" under 18 U.S.C. § 3553(a)(2)(A).

Mr. Bond accepts the Guideline calculation in the PSR, but the resulting range is unduly harsh and is longer than necessary to serve the goals of sentencing in 18 U.S.C. § 3553(a).  The recommended sentence of 120 months is sufficient to serve those goals and is a reasonable outcome for Mr. Bond's conduct.  "[A]ll sentences must be reasonable in light of the criteria in 18 U.S.C. § 3553(a), no matter what the Sentencing Guidelines say."  *United States v. Johnson*, 104 F.4th 662, 667 (7th Cir. 2024) (quoting *United States v. Popovski*, 872 F.3d 552, 554 (7th Cir. 2017)).  "The [sentencing] judge may determine, however, that, in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing."  *Kimbrough v. United States*, 552 U.S. 85, 91 (2007) (quoting 18 U.S.C. § 3553(a)).

**CONCLUSION**

Mr. Bond respectfully requests that the Court impose a sentence of 120 months. That is a lengthy sentence that is several times longer than any term of incarceration that Mr. Bond has ever served before. This sentence is sufficient, but not greater than necessary, to serve all the goals of sentencing in 18 U.S.C. § 3553(a)(2).

Respectfully submitted,

Dated: April 8, 2025

*/s/ Evan C. Greenberg*
Evan C. Greenberg #271356 (CA)
The Law Offices of Evan Greenberg, LLC
231 S. Bemiston Ave., Suite 800
St. Louis, MO 63105
Phone: 314-403-2039
Fax: 650-326-9704
Email: evan@evangreenberglaw.com
Attorney for Defendant